JUDGE ABRAMS

12 CV 8171

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

JEANICE DOLAN, DANIEL A. MALIN,
KEITH VINCENT, and all others similarly
situated,

                                           Plaintiffs,

vs.

BENJAMIN M. LAWSKY, Superintendent of
Financial Services of the State of New York in
his non-regulatory capacity as RECEIVER of
Executive Life Insurance Company of New
York; Certain Predecessor RECEIVERS of
Executive Life Insurance Company of New
York; METROPOLITAN LIFE INSURANCE
COMPANY; and CREDIT SUISSE GROUP
AG,

                                           Defendants.

-------------------------------------------------------- x

Case No. _____

**COMPLAINT**

**(CLASS ACTION)**

**JURY TRIAL DEMANDED**

RECEIVED
NOV 0 8 2012

Representative Plaintiffs, individually and as representatives of the class of Shortfall Payees, hereby allege as follows upon information and belief, except as to those allegations concerning Representative Plaintiffs, which are alleged upon personal belief.   Representative Plaintiffs' information and belief is based upon, among other things, their investigation regarding the New York Liquidation Bureau and other defendants, including, without limitation, review of: Liquidation Bureau and Department of Insurance documents; public statements, testimony, news articles and other publications; transcripts of court proceedings; correspondence and other communications between Liquidation Bureau personnel and others; and consultation with experts and others.   The facts are alleged in their totality and in the alternative.

Certain of the facts further supporting the allegations contained herein are known only to one or more of the Defendants, or are exclusively within their custody and control.   Further, in some instances the names of entities involved are known, but the names of specific individuals acting on behalf of the entities are known only to the defendants.   Representative Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

PARTIES .........................................................................................................................11

CLASS ACTION ALLEGATIONS ...............................................................................14

JURISDICTION, VENUE, AND STANDING ..............................................................15

FACTUAL ALLEGATIONS ..........................................................................................16

*Background:   The Executive Life Insurance Company of New York* ...................16

*The Insurance Department's takeover of ELNY in 1991* ....................................17

*ELNY's solvency* ..................................................................................................19

*The Liquidation Bureau cuts a secret deal to transfer ELNY's "extremely high*
*quality" assets to MetLife without competitive bidding* ................................20

*The MetLife deal* ..................................................................................................24

*The Bureau's retention of the Credit Suisse Defendants* ....................................26

*ELNY after the transfer* .......................................................................................32

*The MetLife Administration Agreement* ..............................................................36

*Communications with policyholders* ...................................................................38

*The Waste of ELNY's Assets by the Liquidation Bureau, Credit Suisse, and MetLife* .........40

*Unsuitable and improper investments* .................................................................40

*Lack of verification of transferred reserves* .......................................................42

*Lack of verification of ceding commission* ..........................................................42

*Suspicious Payments* ............................................................................................44

*Concealment and nondisclosure of ELNY's deteriorating financial condition* ...................45

*Impeding prospective investors* ...........................................................................46

*The Bureau eventually faces exposure* .................................................................49

*Replacement of Credit Suisse in 2009* .................................................................53

*The Bureau proceeds with liquidation* .................................................................54

CAUSES OF ACTION ...................................................................................................55

BREACH OF FIDUCIARY DUTY (The Rehabilitator Defendants)....................55

AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (MetLife) ........57

BREACH OF CONTRACT / UNJUST ENRICHMENT (MetLife)......................58

AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Credit Suisse Defendants)...............................................................................59

FRAUDULENT OMISSION (The Rehabilitator Defendants) ............................61

BREACH OF FIDUCIARY DUTY (Credit Suisse Defendants)..........................62

PRAYER FOR RELIEF .................................................................................................63

JURY DEMAND.............................................................................................................64

## INTRODUCTION

In 1991, the New York Department of Insurance placed the Executive Life Insurance Company of New York (ELNY) into "rehabilitation."  ELNY was not insolvent.  Rather, ELNY's parent company in California had recently been the subject of adverse publicity, as a result of which some policyholders had begun to surrender their ELNY policies in New York. To prevent a potential "run on the bank" (continued surrenders), the New York Superintendent of Insurance obtained a court order on April 23, 1991, giving him control of ELNY and freezing surrenders.

At the time of the takeover, the Representative Plaintiffs and other Shortfall Payees were the named beneficiaries on annuities issued by ELNY.  These annuities were one of three categories of Single Premium Immediate Annuities ("SPIAs"):

(i)      Structured Settlement Annuities ("SSAs"),

(ii)     individual certificates delivered under a group annuity issued by ELNY in connection with the termination by an employer of the employer's defined benefit pension plan ("CQRA"), and

(iii)    all other SPIAs that are neither an SSA nor a CQRA ("Individual SPIAs")

This type of annuity was typically purchased to pay benefits over an extended period of time.  For example, an annuity issued on behalf of an injured child might call for a lump sum payment at age 18, another at 25, another at 45, etc.  Or, if an annuity were purchased for retirement planning, monthly payments might commence at age 65.

Most of ELNY's SPIAs had been issued as part of structured settlements for persons who had been seriously injured, or who had lost loved ones and income providers.  Other SPIAs had

1

been purchased by individuals to provide retirement income.   When ELNY was placed into receivership, the beneficiaries of these annuities became wholly dependent upon the Defendants for the prudent management of ELNY's assets and liabilities.   As the Rehabilitator told annuitants, in investing ELNY's assets, he was investing "your money."

When an insurance company is placed in rehabilitation in New York, the company ceases to be regulated.  The Superintendent of Insurance (now the Superintendent of Financial Services) as Rehabilitator stands in the shoes of the company and is charged with its management.  The Rehabilitator delegates this management role to the New York Liquidation Bureau, a separate entity that acts solely as the Superintendent's agent in his non-regulatory role as rehabilitator, and to a Deputy Superintendent of Insurance in Charge.   The Rehabilitator could, if it so chooses, use any qualified entity other than the NYLB.

The rigorous statutory requirements for filings, reports or certifications imposed on other licensed companies are no longer imposed on estates in rehabilitation; there are no periodic reviews, examinations or communications; there is no regulatory oversight of the operations, assets or finances; and there is no mechanism for regulatory oversight of financial condition or compliance with the insurance law or regulations.  Although the Liquidation Bureau is an office of the Department of Financial Services, it is not a governmental agency when acting as an agent of the Rehabilitator.

Over the next twenty years, Rehabilitator Curiale and his successors oversaw the rehabilitation of the ELNY estate.   By outward appearances, ELNY was doing just fine. Promised payments were made in a timely fashion.  The reality, however, was far different.

Unknown to annuitants, less than a year into the rehabilitation, the Liquidation Bureau cut a secret deal with Metropolitan Life Insurance Company that eventually proved fatal to ELNY's SPIAs.  In what observers characterized as a "sweet" deal for MetLife, then-Special Deputy Superintendent Kevin Foley and the Liquidation Bureau agreed to let MetLife cherry pick ELNY's highest-quality assets, leaving weaker assets as the sole financial support for decades of guaranteed annuity payments.  Accordingly, MetLife acquired very valuable life insurance and deferred annuity businesses without paying the costs of origination and without having to make any payment from its own assets.  In addition, MetLife also acquired a very valuable customer base to which it could market new policies.  Under the deal MetLife was allowed to do this without assuming responsibility for the SPIA's annuities, which it chose not to assume.  Furthermore, it eliminated a competitor and put itself in a position to pay commissions to ELNY from ELNY's former assets.

To make the deal happen, Foley – who later went to work at MetLife – and MetLife had to conceal certain information from the approving court and annuitants.  First, the Bureau had to pretend that genuine competing bids had been sought, when in fact they had not.  Second, the Bureau and MetLife had to understate ELNY's liabilities by at least $300 million, so that the representation could be made that the assets remaining with ELNY matched the remaining liabilities.  Third, the Bureau and MetLife had to inflate – by nearly double – the amount of certain commissions to be paid by MetLife.

To keep these discrepancies from being discovered, the deal was packaged so that MetLife would administer the remaining ELNY liabilities for the indefinite future under a

confidentiality agreement – the only time the Bureau ever outsourced such administration.  As an added bonus to MetLife, it was paid up to $1 million annually for this check-writing service.

Knowing that the rehabilitation of ELNY would be starting out at least $300 million in the hole led to other imprudent decisions.  For example, Foley and the Liquidation Bureau encouraged or allowed an unsuitable investment strategy to try to artificially boost ELNY's assets.  Although the Bureau told annuitants it was investing ELNY's assets conservatively, the opposite was true:  It permitted the Credit Suisse defendants ("CS") to generate millions of dollars in fees through high-risk stock investments, even to the point of repeatedly violating a court order by investing far greater than 30 percent of ELNY's assets in common stock.  ELNY's portfolio resembled more that of a "day trader" than a portfolio managed by a professional money manager and fiduciary charged with investing assets to provide the sole support for payments extending out decades.  Credit Suisse was able to get in a position with the potential to hold ELNY assets in "street name."   To this point plaintiffs have not been able to determine whether that actually occurred, but believe that it is probable that it did.  Holding ELNY assets in street name would have allowed it to engage in highly lucrative securities lending operations using ELNY assets.  The securities lending business may well have impacted on CS's choice of securities as well – since more volatile tech stocks such as AOL, Gateway, Global Crossing, Lehman Brothers, Charles Schwab and Yahoo created more demand for the highly lucrative margin and securities lending businesses which Credit Suisse was known for soliciting.  According to reports published by CS in April of 2000, the yield on common equities was 1.17% as opposed to the much higher return projected in the plan and the total portfolio yield was

4

5.13%, far below the estimates used to formulate the plan.  Consequently, some of the ELNY assets which should have been invested in long-term bonds to match the long-term obligations to plaintiffs and others, were being used to make payments to current payees, creating an improper preference.

Eventually, the inevitable happened:  ELNY's investments crashed, losing hundreds of millions of dollars.  In 2000, ELNY's common stock portfolio lost nearly one-third of its value.  In 2001, it dropped another 13 percent, and in 2002, another 19 percent.  The return on ELNY's common stock was far below the threshold levels needed to sustain long-term benefit payments.

Annuitants had no way of knowing that these breaches were occurring.  MetLife and the Credit Suisse Defendants signed broad confidentiality agreements, and Liquidation Bureau employees were offered substantial sums of money not to disclose what they had witnessed at the Bureau.  The Bureau successfully argued that it was not subject to Freedom of Information laws, and it did not file public reports.  It began resisting even narrow audits by State officials in which it had previously cooperated, and it conducted no audits on its own, even though it was responsible for safeguarding nearly $5 billion in assets.

The Bureau did not have to worry about court intervention.  "[R]eceivership courts in New York are courts of general jurisdiction and not dedicated receivership courts like Federal bankruptcy courts.  Also, courts generally only consider matters brought that are before them, and certainly do not consider themselves to be regulators.  Even if they were so inclined, however, because there are no statutory requirements for filing any financial or actuarial statements or other periodic reports with the court, they would not have the tools necessary to do

so." *See* "Soggy Saga:  Executive Life's Liquidation Drowns Policyholders' Annuitants' Interests in 21 Year Long Process," *Insurance Advocate* (20 Feb 2012).  Action by the rehabilitation court was limited to matters brought before it by the Bureau – so the Bureau never brought any matters before it.

While the rehabilitation dragged on with no oversight and no end in sight, Bureau personnel began to waste ELNY's assets in other ways.  Payments were made to mysterious lockboxes on alleged annuities that were suspect on their face.  The present values of these alleged contracts were not only unheard of in the industry – $40 million for one annuity alone – but virtually impossible given ELNY's limit of $1 million single premiums.  (Tellingly, none of the top ten largest SPIA policyholders filed objections to the proposed plan of liquidation, even though tens of millions of dollars was being cut from their payments.)  Other contracts had issue dates after 1991, when ELNY was no longer writing new business.  The Bureau listed payments to thousands more payees than were reflected in MetLife's records.

What was originally supposedly to be a "four or five year" rehabilitation process was now predicted by the Bureau to take up to *one hundred* years, assuring career Bureau employees of long-term employment and State benefits.  While he was the Special Deputy Superintendent, Joseph Termini literally or in essence, stated at one meeting, "Why would I ever sell this?  All I have to do is clip coupons."

Bureau personnel did have an exit strategy.  For some, it was leaving: By the time ELNY started to unravel, Kevin Foley was Vice President of External and Internal Communications at MetLife (additional NYLB employees involved with ELNY went to MetLife as well).  For

others, it was liquidation: If exposure was threatened, the Bureau would simply put ELNY into a liquidation that it controlled. No outsider would ever see the ELNY books.

A wrinkle developed in late 1999, when an outside group of investors expressed interest in buying ELNY. If ELNY were purchased, the original $300 million understatement, nearly $100 million in suspect annuities, and other anomalies would be discovered. Bureau personnel initially sought to discourage investors by simply denying access to ELNY records. When the investors persisted, they were eventually permitted to look at some documents provided by the Bureau, but not to take notes or make copies.

With the aid of counsel, the investors were eventually allowed greater access to some of the ELNY records. Liquidation Bureau personnel actively discouraged offers, however – ironically, by revealing privately that ELNY's fixed liabilities were actually $300 to $600 million higher than the figure previously represented to the rehabilitation court. The Bureau instructed MetLife not to let the investors see the actual annuity contracts and/or data files, and instructed Credit Suisse not to disclose information about its investment strategies.

MetLife, meanwhile, had another problem. For nearly a decade, it had received hundreds of thousands of dollars per year essentially just to write checks. But it had never properly performed, and the Liquidation Bureau had never made it perform, basic duties called for in its contract. For example, even though the agreement required MetLife to check all payees against the Social Security Death Master Index annually, it had never bothered to do so. With the arrival of persistent investors who wanted to see its records, MetLife tried to make up for lost ground.

Finally checking the database, MetLife discovered that it had been paying dead people with ELNY's money. It began making requests asking for the return of payments.

In July 2001, investors made a proposal to purchase ELNY, conditioned on a contract-by-contract review of ELNY's annuities. These investors also warned the Liquidation Bureau that, from their review, annuitants would face up to a $1 billion shortfall without a significant cash infusion or improved return on investments. The Liquidation Bureau rejected the offer without disclosing it to the rehabilitation court or anyone else, and ignored the warning about shortfalls. Things at the Bureau went back to normal, until another turn of events.

In early 2004, the New York State Comptroller asked to conduct a comprehensive audit of the Liquidation Bureau. Among other things, the Comptroller requested documentation of ELNY's investments and contracts. Bureau officials refused, and the Comptroller served the NYLB with a number of Subpoenas. The NYLB made an immediate motion to quash the Subpoenas. On June 30, 2005, the Bureau received a ruling that the State had no authority to audit the Bureau. The Comptroller appealed.

At this point, Bureau personnel were aware that ELNY's liabilities now exceeded its assets by more than $1 billion, but had done nothing. It was becoming increasingly apparent that the mishandling of ELNY by the Bureau, MetLife, and Credit Suisse was going to be exposed. In mid-2005, then-New York Attorney General Elliot Spitzer was deemed a heavy favorite to be elected governor, campaigning on an anti-corruption and governmental transparency platform. The multi-billion dollar, refusing-to-be-audited Liquidation Bureau would be a prime target.

In late 2005 or early 2006, Bureau officials went to the National Organization of Life and Health Guaranty Associations (NOLHGA), and the two entities began working on a plan to liquidate ELNY.  The Bureau did not inform annuitants of ELNY's insolvency.

In August 2006, the then-Special Deputy in Charge of the NYLB was fired for suspected corruption (of which she was later convicted (plead guilty)).  Governor-elect Spitzer identified an investigation of the Liquidation Bureau as a high priority.  In January 2007, a new Superintendent of Insurance was appointed.  In March 2007, an appellate court ordered the Liquidation Bureau to open its books to the State Comptroller.  The Liquidation Bureau appealed.

Meanwhile, Bureau personnel were scrambling.  Property and Casualty Insurance companies and settlement annuity purchasers began receiving telephone calls or in-person threats demanding that they contribute money to shore up ELNY or face punitive actions by the New York Department of Insurance.  In May 2007, the new Superintendent announced that the Liquidation Bureau was going to be subjected to a "top to bottom" audit by an independent auditor for the first time in the Bureau's history.

When auditors began their work, they discovered the Liquidation Bureau's financial records in complete disarray.  For the audit to take place, Bureau personnel had to "reconstruct" the financial records of all of the Bureau's estates.  Bureau officials also worked to manipulate the audit itself.  For example, although ELNY had many thousands of files, Bureau personnel selected only a few hundred of ELNY's files to be reviewed.  Of those, only 50 percent were SSA's, even though SSA's comprised most of ELNY's liabilities.

In December 2007, Liquidation Bureau personnel told Governor Spitzer and the new Superintendent that a deal had been reached with insurance companies and others assuring 100 percent payment to ELNY policyholders. A delighted governor called a press conference. To enhance the story, Bureau personnel hurriedly arranged for Eric Rabinowitz, a visually impaired ELNY annuitant, to attend, sending a car to drive him to the staged event.

In reality, no deal had been reached. Instead, the Liquidation Bureau was still working privately with NOLHGA on the plan to liquidate ELNY. In October 2008, the independent auditors uncovered what Bureau officials already knew: that the Bureau had been understating ELNY's shortfall by more than $1 billion for years.

Meanwhile, Bureau and NOLHGA were finishing their plan to liquidate ELNY and transfer its assets to a NOLHGA-controlled company to be formed in the District of Columbia. Bureau personnel knew that, under this plan, close to 1500 annuitants would face up to a 66 percent loss of benefits. The Bureau did not disclose its intentions to the Rehabilitation Court until December 2010, when it filed an *ex parte* motion stating an intent to liquidate ELNY, or to annuitants until December 2011, when it began notifying Shortfall Payees for the first time that their benefits were to be cut.

In March 2012, a hearing was held regarding the plan on which the Liquidation Bureau and NOLHGA had been collaborating since 2006. During the hearing, the Bureau successfully prevented annuitants from exploring the causes of ELNY's insolvency. After finding from the evidence presented that ELNY's liabilities exceeded its assets by more than $1 billion, the Rehabilitation Court approved the proposed plan of liquidation.

Under the plan of liquidation, the Representative Plaintiffs and other Shortfall Payees face a loss of benefits exceeding $920 million. Through this action, these victims seek to hold the Liquidation Bureau, MetLife, and Credit Suisse responsible for their malfeasance.

## PARTIES

### A.    Representative Plaintiffs

Jeanice Dolan is a resident of the State of Maryland. She received her structured settlement as a result of injuries sustained in a car accident when she was a child. She received two annuities - one in the amount of $2,000/year for 47 years (to age 65) to fund an IRA, and the second in the amount of $1,172 per month, increasing 4% annually for 40 years certain and life thereafter. She was also to receive lump sums in 1992 in the amount of $12,500; in 1997 in the amount of $22,500; in 2002 in the amount of $37,500; in 2007 in the amount of $62,500 and in 2012 in the amount of $100,000. The present value of her annuity on Schedule 1.15 of the liquidation plan is $815,162.62. Her payments are being cut by 47%.

Daniel A. Malin is a resident of the State of New York. Mr. Malin received his structured settlement as a child as a result of an accident where he was run over by a car which crushed his abdomen and chest, causing his blood pressure to spike, leaving him legally blind. The present value of his annuity is $4,878,756. His payments are being cut by 60%.

Keith Vincent is a resident of the State of Arkansas. He received his structured settlement as a result of injuries incurred while working on the vessel "Jupiter". Mr. Vincent was to receive $9,790.90 per month for 240 months certain, and for life thereafter. The Present Value of his annuity on Schedule 1.15 is $1,667,716. Keith's payments are being cut by 42%.

**B.**     **Defendants**

**1.**     **The Rehabilitators and their agents**

Defendant Benjamin M. Lawsky is the Superintendent of Financial Services of the State of New York, and successor to the Superintendent of Insurance of the State of New York.  For purposes of this action, Mr. Lawsky is joined as a party defendant solely in his non-regulatory personal capacity as Rehabilitator of ELNY ("Mr. Lawsky").

Predecessor Rehabilitators of ELNY, also joined herein as parties defendant in the same capacities, were and are:  Salvatore R. Curiale (1990-1994); Edward J. Muhl (1995–1996); Gregory V. Serio (2001–2004); Howard Mills (2005–2007); Eric J. Dinallo (2007–2009).  Neil D. Levin (1997-2001) is not joined as he is deceased.

At all times from April 23, 1991, through the order of liquidation more than 20 years later, most of the Rehabilitators' duties with respect to the ELNY estate were performed through agents.  The primary agents through whom the Rehabilitators performed their duties were the New York Liquidation Bureau, an office of the New York State Department of Insurance (now the Department of Financial Services), and a Special Deputy Superintendent in Charge.

2.      **Metropolitan Life Insurance Company**

Defendant Metropolitan Life Insurance Company is an insurance company organized under the laws of New York and domiciled in that state ("MetLife").

3.      **Credit Suisse Group AG, First Boston Corporation, and First Boston Asset Management Corporation ("the Credit Suisse Defendants" or "CS").**

First Boston Asset Management Corporation was appointed as financial advisor to ELNY by court order on July 24, 1991.  FBAMC has undergone various name and structural changes since the 1991 order and is presently known as Credit Suisse Asset Management.

Credit Suisse Holdings (USA) Inc. is a Delaware corporation with U.S. headquarters at 11 Madison Avenue.  It is the U.S. holding company of all three branches of Credit Suisse (private banking, asset management, investment banking).  Credit Suisse is licensed to, and at all relevant times, did provide financial services in the state of New York.

In 1988 Credit Suisse acquired a controlling interest in First Boston.  In the mid-1990's Credit Suisse renamed itself CS First Boston or CSFB.  In 2005 CSFB retired the First Boston name and was renamed Credit Suisse.

Credit Suisse is the successor or surviving entity from a merger of Credit Suisse and former corporations The First Boston Corporation ("FBC") and First Boston Asset Management Corporation ("FBAMC").

Credit Suisse assumed the liabilities of FBC and FBAM, contractually and by operation of law.

## CLASS ACTION ALLEGATIONS

The Representative Plaintiffs bring this action on their own behalf and as a class action pursuant to F.R.Civ.P. 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of all Shortfall Payees.   As used herein, "Shortfall Payees" refers to persons who were named beneficiaries of ELNY Single Premium Immediate Annuities who are scheduled to incur a reduction in the present value of their benefits under the plan of liquidation approved by the rehabilitation court on or about April 16, 2012, or a superseding order.   Defendant Liquidation Bureau has a list of all Shortfall Payees with their identifying information.

The Class consists of approximately 1,457 members, which is so numerous that joinder of all members is impracticable.

Members of the class reside in all 50 states.  Of the approximately 1,457 Shortfall Payees, 169 (11.6%) reside in the State of New York.

Representative Plaintiffs' claims are typical of the claims of the members of the Class. Representative Plaintiffs have suffered harm from the identical causes and in the identical manner as other members of the Class.

Representative Plaintiffs will fairly and adequately protect the interests of the other members of the Class and have retained competent and experienced counsel.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Many Shortfall Payees are disadvantaged, physically and otherwise. Additionally, many Shortfall Payees have experienced difficulty in retaining counsel to assist with their ELNY annuities, and would be unable to afford legal representation and expense on an

individual basis.  Additionally, litigating the claims of Shortfall Payees on an individual basis creates a significant risk of inconsistent rulings and obligations.

Common questions of law and fact exist as to all members of the class and predominate over any questions affecting individual members of the Class.  Indeed, the only variable in Class members' claims is the amount of the individual member's shortfall under the Plan of Liquidation.  The amount of each individual member's shortfall is readily calculable and, indeed, has already been calculated by the Liquidation Bureau under the plan of liquidation approved on April 16, 2012.

Defendants Lawsky and MetLife claim to, and are obligated to, have current names and addresses of all Shortfall Payees.  Notice may be provided to such payees via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## JURISDICTION, VENUE, AND STANDING

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2).

2.      Venue is proper in this district pursuant to 28 USC § 1391(b)(2).  The acts and transactions complained of herein occurred in this District.

3.      Certain of the claims herein are or may be asserted derivatively.  Prior to asserting such claims, demand was made on the Rehabilitator to pursue claims for the breaches alleged. The Receiver declined to pursue said claims, or to take any other action to recover for the breaches and losses described herein.

4.      Any demand or further demand of the Rehabilitator to pursue the claims alleged herein is or would be futile.  The Rehabilitator is acting under a material and potentially fatal conflict of interest, as his predecessors will be jointly or separately liable in their personal capacities for the breaches and losses asserted herein.

## FACTUAL ALLEGATIONS

### *Background:   The Executive Life Insurance Company of New York*

5.      Executive Life Insurance Company of New York ("ELNY") was incorporated under the laws of the State of New York on October 24, 1935, and licensed in March 1937. ELNY was, and technically is today, a subsidiary of the Executive Life Insurance Company ("ELIC"), a California company, which owned 97 percent of ELNY's stock.

6.      ELNY's principal office was located in Jericho, Nassau County, New York.

7.      ELNY was licensed to transact business in the states of Arizona, California, Colorado, Connecticut, Delaware, the District of Columbia, Idaho, Indiana, Louisiana, Maine, Maryland, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Utah, Vermont, Virginia, and West Virginia.

8.      SPIA products sold by ELNY included SSAs, CQRAs and other individual SPIAs.  (Post seizure – before included GIC's SPDA's and a variety of life insurance products.)

9.      Each of the Representative Plaintiffs and other Shortfall Payees is a named beneficiary of an ELNY SPIA, and each is scheduled to incur a reduction in the present value of the benefits owed under the SPIA.

10.    ELNY limited single premiums for the purchase of SPIAs to a minimum of $10,000 or $100 of benefit per mode and a maximum of $1,000,000.

11.    In 1991, approximately 44 percent of ELNY's reserves of policies in force were SPIAs, mostly structured settlements.   By percentage (of present value of benefits), the composition of ELNY's SPIAs was approximately the following:   Life Only, 3%; Life with Period Certain, 65%; Joint Life, 1%; Joint Life with Period Certain, 3%; Certain, 18%; Lump Sum (Certain), 10%.

### The Insurance Department's takeover of ELNY in 1991

12.    In early 1991, adverse publicity concerning the financial strength of ELNY's parent corporation, Executive Life Insurance Company, caused some of ELNY's policyholders to lose confidence in ELNY.  These concerns were greatly exacerbated when, on April 11, 1991, ELIC was placed in conservation by the Commissioner of Insurance of the State of California.

13.    The publicity concerning ELIC's financial distress caused a number of ELNY's policyholders to surrender their policies.   According to the New York Superintendent of Insurance, defendant Salvatore Curiale, this "run on the bank" threatened ELNY's financial viability and the security of ELNY's policyholders, particularly those with nonsurrenderable policies which consisted primarily of SSAs, and creditors.

14.    Curiale directed the Life Insurance and Companies Bureau of the Insurance Department to review the current status of ELNY.  On April 12, 1991, the Bureau issued a report stating that it "ha[d] not, at this point, found ELNY impaired or insolvent."  However, the LIC Bureau observed that "[t]he demands on ELNY's assets, through requests for surrenders, are

accelerating at a rapid rate primarily due to adverse publicity over the last three weeks and in particular because of the publicity generated by the placing in conservation of ELNY's parent company by the California Insurance Commissioner on Thursday April 11, 1991. . . . The surrender of a substantial portion of one segment of ELNY's business over the short term will create demands on ELNY's assets that will disadvantage other policyholders."  Under those circumstances, the LIC Bureau stated, "there will be a severe cash flow strain that will result in unwarranted preferences and would result in a waste and dissipation of ELNY's assets."  For those reasons, the Bureau recommended that ELNY be placed under the control of the Superintendent of Insurance.

15.     Based upon the report of the LIC Bureau, the Superintendent determined that further transaction of insurance business by ELNY would be hazardous to its policyholders, creditors and to the public, and, therefore, petitioned the Supreme Court of the State of New York, County of Nassau ("the Rehabilitation Court"), for an order of rehabilitation of ELNY.

16.     An Order of Rehabilitation was entered on April 23, 1991.  Among other things, the Order:

        a)      appointed Defendant Salvatore Curiale as Rehabilitator of ELNY.

        b)      authorized and directed Mr. Curiale to take possession of ELNY's property, conduct the business thereof and take such steps toward the removal of the conditions which made ELNY's rehabilitation necessary.

        c)      prohibited "all" persons, including the Rehabilitator, from "doing or permitting to be done any act or thing which might waste the assets" of ELNY.

17.     Consistent with normal practice, the Rehabilitator delegated most of his duties to the New York Liquidation Bureau, headed by a Special Deputy Superintendent in Charge.  The Special Deputy Superintendent at the time was Kevin Foley.

*ELNY's solvency*

18.     Rehabilitator Curiale and his agents consistently acknowledged – indeed, emphasized – that ELNY was solvent.  For example, on April 16, 1991, Defendant Curiale stated, "[ELNY] isn't insolvent and has ample cash on hand to pay life insurance death benefits and meet annuity payments."  Curiale further stated, "The company is currently neither in an insolvent or impaired condition. . . . I have not petitioned the Court to make a finding of insolvency.  ELNY is a company well able to meet its current obligations."  In May 1991, Mr. Curiale testified before Congress that ELNY was not insolvent.

19.     During the year following the takeover, the Rehabilitator conducted "an extensive and detailed," "careful and exhaustive," "comprehensive" "full study" of ELNY's liabilities and assets.  Following this review, the Rehabilitator reaffirmed that ELNY was solvent.

20.     For example, on September 23, 1992, Deputy Superintendent Kevin Foley stated that, at the time of the takeover,

> the New York company, left to its own devices, was in reasonably good shape. . . . [T]he primary reason we wanted to stop surrenders of policies is that the rate of surrender cannot be predicted and therefore, the company is in a hazardous situation when it doesn't know what the run on its liquidity will be. . . . [U]nder normal circumstances does the company have all the money it needs.  The answer is yes.  So, under what responsible basis could we come and say, it's handy to declare liquidation here and get money from other companies, when in fact, the money is there, under an orderly plan? . . . [T]he company does have the money. . . . (155) [W]e caught this company before it went under (159) . . . .  The first defense, the primary defense and the legal defense that the guaranty

corporation would have is that the company is, indeed, not insolvent, that hasn't changed, fortunately. (161) . . .

21.     In 1992, Mr. Foley stated that the rehabilitation process for ELNY was expected to take three to five years.

**The Liquidation Bureau cuts a secret deal to transfer
ELNY's "extremely high quality" assets to MetLife without competitive bidding**

22.     It is rare for a life insurance company to be liquidated immediately in whole or in substantial part. In nearly all instances, life insurers placed into rehabilitation or conservation are sold to, or merged with, other life insurance companies. Consistent with this normal practice, when the Rehabilitator took control of ELNY in 1991, he stated that his plan was to find a buyer for ELNY.

23.     In or around June 1991, the Receiver contacted the Life Insurance Guaranty Corporation of New York (LIGCNY) to discuss the disposition of ELNY.

24.     The Rehabilitator shared financial information with LIGCNY regarding ELNY's assets and liabilities. LIGCNY advised the Receiver that it (LIGCNY) had no jurisdiction or authority with regard to ELNY because ELNY was not insolvent.

25.     Because it was the largest domiciled insurance company in the state of New York, Metropolitan Life had a lead position in LIGCNY.    Through the Receiver's interaction with LIGCNY, MetLife received information regarding ELNY's assets and liabilities that was not available to other insurers generally or to the public.

26.     Between June and November 1991, the Liquidation Bureau entered into discussions with MetLife. Upon information and belief, the principal individuals engaged in

these discussions were then-Special Deputy Superintendent in Charge Kevin Foley – who later went to work at MetLife – and MetLife Chief Executive Officer, Schwartz.

27.     In those discussions, an agreement was reached with respect to certain of ELNY's assets.  In the deal, MetLife would receive more than $1.5 billion of ELNY's traditional whole life, term life and single premium deferred annuity books of business, along with approximately $1.5 billion of ELNY's highest-quality assets.

28.     An important part of the services The First Boston Corporation (later Credit Suisse) was to provide for the benefit of the ELNY estate and Plaintiffs (*see infra*) was, if asked, to find a purchaser who would and could honor ELNY's contractual obligations to its policyholders.   Because the Liquidation Bureau and MetLife reached a private deal, the Bureau never required First Boston to find a buyer.

29.     To implement the deal, competing bids had to be discouraged or impeded.   The Liquidation Bureau took several steps to prevent the submission of such bids, including:

    a)     The Bureau made no effort to solicit bids.

    b)     The Liquidation Bureau and The First Boston Corporation prepared an "Offering Memorandum" that mirrored the deal already cut with MetLife.   The Offering Memorandum did not contemplate or allow any bids on different segments of ELNY's business or on ELNY in its entirety.

    c)     The Liquidation Bureau tailored the Offering Memorandum such that MetLife would be one of only a few companies deemed eligible to bid, and the insurance companies with the greatest interest would be disqualified.   For example, the Bureau limited

eligibility to insurers already licensed in New York.  An existing license in New York was worth millions of dollars, because the ability to do business with Wall Street brokerages was extremely valuable.  Consequently, by limiting eligible purchasers to those who already had a New York license, the Bureau materially decreased the value of ELNY by eliminating an attractive incentive for insurers licensed in other states.  (This limitation also eliminated the possibility of new competition for MetLife in the New York market.)

          d)      The Bureau stated a requirement that bidders have "substantial financial strength, significant relevant experience and appropriate licenses . . .," which were undefined and thus subject to the Rehabilitator's unilateral determination.

          e)      Foley directed that the Offering Memorandum be sent only to the few companies who affirmatively requested it.

          f)      The Liquidation Bureau did not provide the same financial information to other potential bidders that it had provided to MetLife.

          g)      Having had the information for several months, and having already negotiated the terms of the deal, MetLife was able to submit a substantial draft proposal in mid-December 1991.  Other potential bidders were given less than a month to submit proposals, and requests for additional time were summarily denied.

          h)      The few bidders who were able to submit a more specific initial proposal were rejected without further negotiation.

    30.      The Liquidation Bureau worked with MetLife to draft a letter of intent.  Drafting was completed by mid-January, and announced in late January 1992.

31.     To implement the agreement with MetLife, Foley submitted a proposed rehabilitation plan for approval of the transaction.    A proposed plan was drafted and submitted to the Rehabilitation Court in March 1992.

32.     In the petition, Rehabilitator Curiale represented that, following "an extensive and detailed analysis . . . of (a) the assets which ELNY will retain after the sale, (b) the investment strategy for those assets and the expected rate of return thereon under various interest rate scenarios, (c) the ceding commission ELNY will receive in connection with the transfer to, or assumption by, MetLife of the SPDAs and Life Policies, and (d) the payments ELNY will receive in connection with the transfer to, or assumption by, MetLife of the SPDAs and Life Policies, and (d) the payments ELNY is obligated to make on the SPIAs, Petitioner, as Rehabilitator, determined that the transaction proposed in the Plan would not impose any unwarranted or unreasonable risks on ELNY's SPIA holders, creditors or shareholders."

33.     Curiale represented that the Plan "(a) preserves, through a New York domiciled life insurance company having superior financial strength and stability, the account values of, and the death benefit protection afforded to, ELNY's various policyholders, and (b) maintains ELNY's payment obligations to its policyholders."

34.     Neither the Rehabilitator nor MetLife disclosed to the Rehabilitation Court or anyone else the existence of a prearranged deal, or the lack of a competitive bidding process. Instead, Foley falsely stated that all other companies simply were not interested, or "decided to pass," or that, after considering other proposals, the Bureau had determined that the MetLife proposal was the best.

35.     Foley and the Bureau represented that, after the transfer of assets to MetLife, ELNY's remaining assets and liabilities would be approximately equal.  That was not true.  In actuality, after the highest-value assets were transferred to MetLife, ELNY's remaining assets were less than its fixed liabilities by at least $300 million.

36.     Foley and MetLife also inflated the amount of a cash commission expected to be received from MetLife as part of the deal.  Publicly, the Liquidation Bureau stated that MetLife was expected to pay a "ceding commission" of between approximately $70 million and $155 million.  Foley and the Bureau stated that the expected payment would "approximate $139 million," that "we would expect that up to a $150 million for ELNY could be realized in our negotiations as a result of our negotiations with Metropolitan."

37.     These statements were untrue.  Privately, the Liquidation Bureau and MetLife had agreed that the expected ceding commission would be only around $80 million.

38.     Representatives of MetLife were present on September 23, 1992, when Foley made the foregoing misstatements and omissions regarding the MetLife deal, and were otherwise aware of the misrepresentations, which were also included in written filings with the rehabilitation court.

### *The MetLife deal*

39.     As agreed, MetLife received ELNY's traditional whole life, term life and single premium deferred annuity books of business, along with a purported equivalent amount of cash or cash-equivalent assets.  The NYLB did not publish ELNY financial statements until the 1994 statement was published in 1995.  Although the NYLB was required to file a list of the assets

transferred to MetLife with the court, plaintiffs have not found such a list in the court file or elsewhere.

40.    The products transferred to MetLife included 52,748 Single Premium Deferred Annuities and 80,891 life insurance policies.

41.    This large book of business presented a unique asset building opportunity at essentially no risk to MetLife.  By its acquisition of the attractive assets, MetLife was able to increase its assets by more than $1 billion in a single transaction.

42.    In addition to receiving cash, MetLife was allowed to pick and choose from among ELNY's bonds.  For example, contrary to Deputy Superintendent Foley's claim that "no life insurance company" wanted ELNY's lower-grade bonds (below grades 1-2 as rated by First Boston), MetLife received $213 million of ELNY's Grade 5 bonds.[1]

43.    The assets to be transferred to MetLife were represented to the court as:

| First Boston Credit Rating Category | December 31, 1991 Statement Value (millions) | December 31, 1991 Market Value (millions) |
|---|---|---|
| 1 | 498 | 523 |
| 2 | 91 | 91 |
| 3 | 5 | 6 |
| 4 | 54 | 55 |
| 5 | 213 | 212 |

---

[1] According to 1991 Congressional testimony by Rehabilitator Curiale, bonds below grades 2-3 were considered ELNY's "junk" bonds. *[1991 Congressional testimony, p. 51 ("The NAIC's SBO office, which grades these vehicles, has six categories.  The first two are an investment-grade category of bonds, not junk.  Number three is sort of medium grade; you could call it junk, but some of the companies all over America that are issuing these bonds wouldn't like that.  Then there are four, five, and six.  Getting down to six, that is the type of junk bond security which is in default.")]*

| 6<br>Subtotal | 9<br>870 | 9<br>896 |
|---|---|---|
| Policy Loans | 45 | 45 |
| Accrued Interest, Cash and Short Term | 613 | 613 |
| Total Assets Transferred | 1,528 | 1,554 |

44.   MetLife was also permitted to charge "substantially higher surrender charges" than allowed under the ELNY contracts. *[Pet. for Rehab. Plan, ¶¶ 27-28 and Plan]*

### The Bureau's retention of the Credit Suisse Defendants

45.   Acting through Deputy Superintendent Kevin E. Foley, on June 7, 1991, the liquidation bureau filed a verified petition stating:

> Petitioner seeks by this verified petition, this court's approval of retention of the First Boston Corporation ("First Boston") to act as an exclusive financial advisor with respect to certain matters pertaining to the rehabilitation of ELNY. Petitioner also seeks this court's approval of a related investment advisory and management agreement with First Boston Asset Management Corporation ("FBAMC") and a related Indemnity Agreement as defined herein (collectively "Agreements") which are summarized below.

6791 Verified Petition, pg. 2, ¶6.

46.   The Liquidation Bureau also requested the court's approval of a "letter agreement" executed by the Bureau and First Boston on May 30, 1991. (*Id.* at pg. 3, ¶8.)

47.   The proposed agreements with First Boston and its sister company, FBAMC (collectively referred to herein as "First Boston"), provided for the payment of multi-million dollar fees.  The letter agreement provided that in addition to First Boston's being paid $540,000 as compensation in its initial financial advisor role, First Boston would also be paid sales

commissions of 8 or 4 basis points, or a combination thereof, of the "statutory carrying value" of ELNY assets sold, transferred, or otherwise disposed of, even including, the assumption of obligation by the Life Insurance Company Guarantee Corporation of New York or any other life guaranteed fund and any other state. (May 30, 1991 letter agreement, pgs. 2-3.)  Said letter agreement also provided that, under certain circumstances, such sales commissions would be owing to First Boston, even if it had been terminated. (*Id.* at pg. 4.)  Eight basis points of $3 billion in ELNY assets equals $24 million dollars.

48.    In addition, under the proposed Investment Advisory and Management Agreement, dated May 30, 1991, First Boston ("FBAMC") would be the exclusive investment advisor for ELNY's "high yield portfolio" and the exclusive investment manager of ELNY's "high grade portfolio." (Investment Advisory and Management Agreement, pgs. 1-2.)  For providing such services, First Boston was to receive 10 basis points per year on the face value of the assets in the high yield portfolio and four basis points per year on the face amount of the assets in the high grade portfolio. (*Id.* at pgs. 3-4.)  Ten basis points of $3 billion is $30 million.

49.    As further consideration for its services, First Boston was also entitled to have the exclusive right to execute transactions for the high yield portfolio, to select the brokers to make such transactions and to share in the brokerage commissions. (*Id.* at pg. 2.)  First Boston would also have the same rights with respect to transactions dealing with the high yield portfolio. (*Id.* at pg. 4.)  Because of such relationships, First Boston (later Credit Suisse) would be able to get in a position with the potential to hold ELNY assets in "street name." (To this point plaintiffs have not been able to determine whether that actually occurred, but believe it is probable that it did.)

Holding ELNY assets in street name would have allowed First Boston to engage with the potentially highly lucrative securities lending operations using ELNY assets.

50.     As further additional consideration for its services, First Boston Asset Management Corporation would be allowed to use First Boston Corporation in carrying out ELNY asset transactions and First Boston Corporation was given the right to "charge Client [ELNY] its customary mark-up." (*Id.* at pg. 5.)

51.     In seeking approval from the court for the use of such highly compensated assistance, Deputy Superintendent Foley provided sworn testimony that:

> The Rehabilitation of Executive Life presents the Liquidation Bureau with a task of unprecedented size and complexity. The Bureau has been called upon to manage a company with over $3 billion in assets and over 100,000 policyholders.

(July 1991 Affidavit of Kevin E. Foley, pg. 15, ¶29.)

52.     Also, in his July 1991 affidavit, Deputy Superintendent, Kevin E. Foley, testified:

> I must have complete and detailed information about the assets and liabilities that constitute the Executive life estate.
>
> The complete and detailed information referred to in paragraph 14 does not presently exist. It must be developed through professional financial analysis of a degree of sophistication not available in-house in the Liquidation Bureau. . . Financial consultants are, therefore, indispensable to prudent management of the Executive Life estate. (Emphasis added.)

(*Id.* at ¶¶ 14-15.)

53.     On July 23, 1991, the court issued its order approving the Liquidation Bureau's use of First Boston and approving the proposed contracts with First Boston. By incorporating the proposed agreements by reference into its order, the court granted First Boston considerable

discretion and latitude in directing and managing the investment of approximately $3.3 billion in

ELNY assets.    Due to lack of the requisite sophistication and expertise, both the court and the

Liquidation Bureau were required to place a large amount of trust and reliance on First Boston.

54.    Under the terms of the Investment Advisory and Management Agreement (May

30, 1991),

> FBAMC [First Boston] will act as the exclusive investment manager to the Client
> with respect to the consideration and implementation of alternatives regarding the
> high grade portfolio.  FBAMC agrees to supervise and direct, with full authority
> and at its discretion, on Client's behalf and at Client's risk, the investment of the
> assets contained in the high grade portfolio in such manner as FBAMC may deem
> advisable, in accordance with the High Grade Investment Guidelines provided by
> the Client.

(*Id.* at pg. 2.)

55.    While this agreement refers to "High Grade Investment Guidelines" (to be

provided by the Liquidation Bureau) on information and belief, plaintiffs allege that no such

guidelines were provided or even existed.

56.    The aforesaid agreement also provides:

> Other than the High Grade Investment Guidelines, the investments made on
> behalf of the Client by FBAMC shall not be restricted in any manner, whether
> such restrictions arise under the current or future laws of any jurisdiction, by
> virtue of the terms of any contract or instrument purporting to bind the client or
> FBAMC or otherwise.

*    *    *

> All assets purchased for the High Grade Portfolio and asset positions reflected in
> a periodic report to the Client will be deemed to be in compliance with any
> investment restrictions and will be deemed approved by the Client unless written
> notice to the contrary is received by FBAMC from the Client within 30 days of
> the first notice of any such purchase or asset position.

FBAMC may place orders for the execution of transactions for the High Grade Portfolio with or through any brokers, dealers or banks that FBAMC may select without prior notice to the client. . . .

*Id.* at pg. 2-3.

57.     On information and belief, plaintiffs allege that the Liquidation Bureau never expressed disagreement with or opposition to First Boston's investment decisions or transactions either with respect to the High Grade Portfolio or the High Yield Portfolio and First Boston was given very wide latitude and discretion in its actions with respect to the investment of ELNY assets.

58.     Although the Investment Advisory and Management Agreement contemplated that at appropriate intervals, First Boston's actions and decisions with regard to the ELNY assets would be presented to the court for approval, there is no evidence in the court record that this occurred.

59.     First Boston used its superior knowledge and expertise, its lack of accountability to the court and the failure of the Liquidation Bureau to provide direction or restraint to First Boston, to invest ELNY's assets in violation of its contractual obligations, in violation of the court's order, in violation of its representations to the Liquidation Bureau and the court, and in violation of its fiduciary duties to plaintiffs.  In addition, First Boston was negligent and failed to act as a reasonably prudent investor should have acted under the applicable circumstances.

60.     In order to obtain the benefits of being retained regarding the ELNY estate, First Boston made a commitment of secrecy with the Liquidation Bureau.  It agreed:

All information and advice furnished by either party to this agreement shall be treated as confidential and shall not be disclosed to third parties except as required by law and, with respect to information provided by client, except as permitted by client; provided, however, that FBAMC may disclose such information to FBC as necessary to perform FBAMC's services to client hereunder.

*Investment Advisory and Management Agreement (05/30/91), pg. 5, ¶E.*

61.     Jointly with and/or through the Liquidation Bureau, First Boston represented to the court that the only possible course of action was to transfer virtually all of ELNY's investment grade assets to Metropolitan Life in exchange for Metropolitan's assuming ELNY's obligations to only part of its policyholders.

62.     First Boston played a key role in the development of the, "Plan of Rehabilitation for Executive Life Insurance Company of New York," dated March 26, 1992, which was presented to the court.

63.     First Boston knew and intended that the court, and to a lesser degree, the Liquidation Bureau, would rely on its advice and representations in determining whether said plan would be approved.  To cause the court to approve the plan, First Boston, acting jointly with the Liquidation Bureau, and/or acting through the Liquidation Bureau, represented to the court that with First Boston's management of the assets that would remain after the asset transfer to MetLife, there was more than a 90 percent chance that the remaining assets would be sufficient to meet 100% of ELNY's obligations to the beneficiaries of the single premium immediate annuities ("SPIAs").  (Rehabilitation Plan, pg. 5.)

64.     First Boston, along with the Liquidation Bureau, further represented to the court:

> . . . FBAMC developed an investment strategy concerning the reinvestment of ELNY's assets as they mature or are recovered consistent with the extremely long-term nature of the SPIA liabilities. Pursuant to this strategy, principal and interest realized upon maturity or recovery of ELNY's bonds, . . . will be reinvested in long-term (30 year) investment grade corporate bonds and in Standard & Poor's 500 common stocks.

*(Rehabilitation Plan, pg. 11.)*

65.     It was further represented that First Boston recognized the very long term nature of the SPIAs and the commensurate need to reduce ELNY's investment risk and it had adopted an investment strategy with risk characteristics comparable to those used for pension and endowment funds.  *(Rehabilitation Plan, pg. 11.)*

66.     In reliance on the above representations, the court approved the proposed Rehabilitation Plan, which provided for periodic filings with the court reporting on the status of the Plan as it was implemented.

### *ELNY after the transfer*

67.     As Deputy Superintendent Foley acknowledged, under the deal, MetLife received "extremely high quality" assets, and ELNY was left with lower-quality assets.

68.     Deputy Superintendent Foley and the Liquidation Bureau were aware that, after the transfer of ELNY's most valuable assets to MetLife, ELNY remained obligated to tens of thousands of annuitants and pensioners over a very long period of time.  (Plaintiffs do not know the precise number of the active and deferred contracts in 1991.  However, as of December 31, 1994, there were 23,666 ELNY annuity contracts in force, 5,969 of which were deferred.)  As

Mr. Foley stated on September 23, 1992, "many of these people expect payments well into the next century."  ELNY's remaining liabilities had "an extremely long tail."

69.     Deputy Superintendent Foley and the Liquidation Bureau knew that the assets remaining with ELNY were the sole source of funding for these long-term payments.   These assets were summarized as:

| [Bonds] First Boston Credit Rating Category | December 31, 1991 Statement Value (millions) | December 31, 1991 Market Value (millions) |
|---|---|---|
| 1 | 7 | 7 |
| 2 | 9 | 9 |
| 3 | 37 | 35 |
| 4 | 80 | 83 |
| 5 | 311 | 287 |
| 6 | 552 | 505 |
| 7A | 152 | 98 |
| 7B | 28 | 7 |
| 8 | 175 | 159 |
| Accrued Interest, Cash and Short Term | 16 | 16 |
| Total Assets Allocated to SPIAs | 1,367 | 1,205 |

70.     Deputy Superintendent Foley stated that, after the transfer, "we will make continued full payment" to annuitants, that he was "fully confident that these payments can and will be made," and that it was a "100 percent guarantee."

71.     To bolster the perception that the assets remaining with ELNY would be sufficient to satisfy ELNY's long-term liabilities (as represented), the Liquidation Bureau asked

an actuary, Milliman & Robertson, to render opinions regarding the sufficiency of remaining assets based upon certain assumptions and investment strategies.

72.     The investment strategies were provided to Milliman by The First Boston Corporation and the Liquidation Bureau, and included:

> Pursuant to this strategy, principal and interest realized upon maturity or recovery of ELNY's bonds, as well as other cash flows derived from investments contained in ELNY's asset portfolio, will be reinvested in long-term (thirty (30) year) investment grade corporate bonds and in Standard and Poor's 500 common stocks ("Common Stocks"). The reinvestment in Common Stocks will be limited so that Common Stocks will not at any time exceed 30% of the book value of the assets comprising the ELNY portfolio. In addition, in recognition of the equity-like risks of the lower quality bonds in the existing ELNY portfolio, the investment in Common Stocks and bonds in FBAM's three lowest credit quality categories will, on an aggregate basis, be limited to 50% of the book value of the portfolio at any point in time. Due to this aggregate 50% limit, aggregate Common Stock investments are not anticipated to constitute 30% of ELNY's assets until 1997, when the percentage of lower tier bonds is projected to be reduced below 20%." *[Plan of Rehabilitation, p. 11]*

73.     "Under the proposed strategy, new money is invested in common stocks and investment grade bonds. All new money is invested in stocks, but only to the extent that stocks are less than 30% of assets and only as long as stocks plus lower quality non-investment grade bonds (FBC 6, 7, and 8's) are less than 50% of the portfolio. When necessary, common stocks are sold to keep common stocks down to 30% of the portfolio."

74.     First Boston Corporation also provided Milliman with a base assumption that, over the long term, common stocks would provide an annualized return of 13%, of which 3.5% would be dividends and the remainder would be capital gains.

75.     Milliman did not audit or independently verify any of the information or assumptions provided to it.     Based upon First Boston Corporation's projections and

representations, Milliman used computer models and programs to project future financial results for 500 possible patterns of future interest environments.  More particularly:

> Interest scenarios were randomly generated based on parameters provided by First Boston as to the likelihood of various possible future levels of interest rates.

> Investment returns (including defaults) on non-investment grade bonds were developed by First Boston based on a detailed review of the bond portfolio.  Investment returns on investment grade bonds reflect spreads to Treasury which First Boston developed based on historical averages.

> The reinvestment strategy was selected by First Boston and the Rehabilitator so as to optimize results based on consideration of risk, taxes, and the nature of ELNY's remaining liabilities.

> Returns on common stocks reflect assumptions provided by First Boston based on historical return levels.  We have also presented tests of the sensitivity of the results to alternative assumptions with respect to returns on common stocks.

76.    Based upon the assumptions provided by the Liquidation Bureau and The First Boston Corporation, the Bureau represented that "the investment strategy adopted by [the Receiver] does not impose any unreasonable risks on ELNY's SPIA holders, creditors or shareholders."    The Bureau represented that, in more than 90 percent of 500 randomly generated interest rate scenarios under FBAM's base case assumptions, ELNY's SPIA obligations are satisfied in full."

77.    The Receiver represented that, "Under the M & R Study, the projected cash flows from the Remaining Assets were sufficient to meet 95% of the SPIA obligations under approximately 99% of the scenarios tested using FBAM's base case default, recovery, yield and rate of return assumptions."

### *The MetLife Administration Agreement*

78.     Part of the agreement with MetLife included the retention of MetLife to service ELNY's remaining SPIAs.  (The Rehabilitator said that MetLife's proposal "contained the only offer to administer ELNY's payment obligations under those policies or contracts remaining with ELNY under the Plan[.]"

79.     Under this arrangement, ELNY's true liabilities would be ascertainable only by the Liquidation Bureau and MetLife, the only two entities with access to the actual annuity contracts.

80.     The Administration Agreement between the Rehabilitator and MetLife included the following provisions:

> Administrative Services.  (a) MetLife shall provide the administrative services specified in Exhibit B hereto, subject to all of the terms and conditions of this Agreement (including Exhibit B).  Such services shall be provided in substantially the same manner that MetLife services other policies and contracts of the same or substantially similar types except as may be required by the provisions of this Agreement.

> *     *     *

> Reports and Accounts; Audits.  MetLife shall provide to the Rehabilitator such reports as may from time to time be required by law or regulation or which the Rehabilitator may reasonably request.   MetLife shall maintain records of transactions conducted in performing its obligations under this Agreement, and such records shall be available for review and inspection by the Rehabilitator at any reasonable time and place.

> *     *     *

> Confidentiality.  MetLife shall not, except as may be required by law, give the Records or other information that it receives from ELNY or the Rehabilitator or on their behalf under this Agreement to any other party (except as may be necessary in connection with the consummation of the transactions contemplated by this Agreement).

\*   \*   \*

a. <u>Payment Activity Reports.</u>  On or about the fifteenth business day of each month MetLife shall (a) furnish the Rehabilitator with a summary which reflects all payment activity for the prior month on an individual and aggregate basis and (b) furnish a monthly check register to closeout contractholders.

\*   \*   \*

<u>Death of Payee.</u>  MetLife shall stop making payments that are contingent upon the continued life of any person, or shall change the person to whom payments are made (if payments continue after death to another person) as soon as reasonably possible after MetLife is advised of the death of such person.  MetLife shall audit whether payees are alive on an annual basis using the Social Security Administration's death indicator files (to the extent available) to determine if any payee has died.  If MetLife discovers in this manner that a payee has died, it shall cease payment or change the payee (as the case may be).  MetLife shall attempt on behalf of ELNY to recover any overpayment resulting from payment after death.  Such attempt will consist of up to two letters seeking recovery of the overpayment.  In the event of the death of a payee, MetLife shall determine the beneficiary based on the Records or on notification received from the Rehabilitator, ELNY, the payee or any other interested party, calculate and make payment of the amount payable to the beneficiary and update its records as appropriate.

\*   \*   \*

<u>Reserve Calculations.</u>  MetLife shall provide the Rehabilitator with such information and calculations as are necessary to determine statutory reserves for the quarterly and annual statements of ELNY with respect to the business administered by MetLife.  Such information and calculations shall be prepared in such manner as MetLife uses with respect to its own comparable blocks of business for quarterly and annual statement purposes and shall be provided to the Rehabilitator in time for the quarterly and annual statements of ELNY to be filed on a timely basis. . . .

81.     Under the Administration Agreement, MetLife was paid a monthly fee of $5.50 per payee if payments had begun or would begin before the last day of the month, and $2.50 per payee if payments have not begun or will not have begun as of such date, in each case based on contracts in force on the first day of the month.

37

82.     Between January 1, 1993, and the present date, MetLife has been paid between $447,694 and $1,362,261 each year to perform these services.

### *Communications with policyholders*

83.     After the April 1991 takeover, the Receiver sent periodic mailings to policyholders.  Those mailings purportedly were intended to inform policyholders of the status of their respective policies and contracts with ELNY during its rehabilitation.

84.     On or about May 17, 1991, a letter signed by Deputy Superintendent Foley was sent to "Policyholders, Annuitants and Contract Holders" of ELNY.

85.     Mr. Foley's May 17, 1991, letter confirmed that the sole basis for ELNY's rehabilitation had been the risk of surrenders.  ("This appointment was necessary because adverse publicity surrounding ELNY's California affiliate had stimulated a hazardous number of surrenders of ELNY annuity contracts.  These surrenders could only be safely controlled through a rehabilitation proceeding and the temporary moratorium [on surrenders] described below.")

86.     With respect to SPIAs, Mr. Foley's letter stated:  "The Rehabilitator is presently paying 100% of periodic payments under annuities and structured settlements in the manner set forth in the governing contracts under the payment modes now in effect."  The letter told annuitants that the Rehabilitator was "presently analyzing the assets and liabilities of ELNY[.]"  Foley stated:  "We shall continue to advise you of further developments."

87.     The next communication from the Rehabilitator to annuitants was a letter from Deputy Superintendent Foley dated October 9, 1991.  This letter again reiterated that the original takeover was due to surrender requests.  ("The inordinate number of withdrawal requests, and

attendant potential grave consequences to ELNY, necessitated the rehabilitation proceeding and current moratorium on loans, withdrawals and surrenders.")  The October 1991 letter advised annuitants that the Rehabilitator had "continued to analyze ELNY's assets and liabilities with the assistance of a team of actuaries, insurance experts and investment bankers."

88.    The October 1991 letter stated that involvement of the life insurance guaranty associations was an option, but the Rehabilitator had been informed by LIGCNY that it had no authority or jurisdiction because ELNY was not insolvent.  The October 1991 letter from Foley stated, "it remains our belief that ELNY policyholders, annuitants and contract holders will receive 100% of the amounts due them under any of the options chosen as part [of] the rehabilitation plan."

89.    The October 9, 1991, letter from Foley to policyholders, annuitants and contract holders stated, "Please be assured that your money is being well protected and conservatively invested by the Rehabilitator."

90.    On or about January 21, 1992, Rehabilitator Curiale and Deputy Superintendent Foley sent a letter to all policyholders and annuitants.  The letter stated that, since Mr. Curiale's appointment as Rehabilitor, the assets and liabilities of ELNY had been analyzed.  The letter stated that the Rehabilitator was proposing a transfer of assets to MetLife, and that "[t]he contemplated exchange and reinsurance agreements [with MetLife] would place you in a substantially similar position as you were at the time of the entry of the Rehabilitation Order." With respect to "Immediate Annuities and Structured Settlements," the letter stated:  "Full benefit payments would continue without interruption."

91.    The January 21, 1992, letter from Curiale and Foley represented: "[Y]ou will be provided with detailed information concerning the Rehabilitation Plan and notified of all judicial proceedings. . . . We shall continue to advise you further developments."

92.    On April 13, 1992, the Superintendent Curiale and Deputy Superintendent of Insurance in Charge Kevin Foley sent a letter to all policyholders and annuitants.  The letter stated that the proposed transfer of assets to MetLife "best protects all classes of ELNY policyholders and provides security, value, fairness, timeliness and practicality."

### *The Waste of ELNY's Assets by the Liquidation Bureau, Credit Suisse, and MetLife*

### *Unsuitable and improper investments*

93.    As noted, by letter dated October 9, 1991, Deputy Superintendent Foley told policyholders and annuitants:  "Please be assured that your money is being well protected and conservatively invested by the Rehabilitator."

94.    The Liquidation Bureau and the Credit Suisse Defendants were aware that ELNY's payment obligations were extremely long tail, extended out decades, were fully predictable, and were supported entirely by ELNY's remaining assets.  After allowing MetLife to take ELNY's premium producing business lines, prudent investment strategy would have sought a steady, low-risk return on investments to support the long-term annuity obligations. Assets supporting long-term future obligations or deferred payments should not have been commingled with assets supporting current or short-term obligations.

95.    Under the Order of Rehabilitation, no more than 30 percent of ELNY's assets could be invested in common stock at any given time.  Additionally, the Liquidation Bureau

represented to the Rehabilitation Court and to others, including its actuary, that it would adhere to the 30 percent cap, selling stock when necessary to bring the portfolio into compliance.[2]

96.     Under its contract with the Liquidation Bureau, First Boston Asset Management (later Credit Suisse) had broad discretion over ELNY's portfolio. *See* ¶ 52-57, *supra*.

97.     The Credit Suisse Defendants did not invest ELNY's assets prudently. Nor did they invest ELNY's assets in a manner consistent with the nature of the liabilities, *i.e.*, extremely long-term payments to annuitants, many of whom had suffered catastrophic injuries or loss. They also failed to place assets in separate accounts or to otherwise invest for the benefit of contracts that were in deferred status for many years, in some cases decades. This created impermissible preferences as current pay annuitants were favored over those in deferral status.

98.     Instead, the Credit Suisse Defendants engaged in a pattern of risky investments that generated high management fees, but that placed ELNY's assets at considerable risk. In 1998, common stock comprised 38 percent of ELNY's portfolio; by 2000, it reached as high as 44 percent.

99.     Upon information and belief, the Liquidation Bureau allowed these risky strategies in an effort to achieve balance between ELNY's assets and its true liabilities (which it had materially understated in 1992). Alternatively, the Bureau lacked the resources, knowledge, or ability to adequately monitor the Credit Suisse Defendants.

---

[2] The 30 percent cap of investment in equities was 50 percent more than the percentage allowed by active insurance companies.

100.    Initially, ELNY's high-risk portfolio saw favorable paper returns.  However, the inherent risks in the Defendants' investment strategy ultimately caused enormous losses.   In 2000, ELNY's common stock portfolio lost hundreds of millions of dollars, nearly one-third of its value.  In 2001, it dropped another 13 percent, and in 2002, another 19 percent.  ELNY was never able to climb out of that hole.  Had ELNY employed a more prudent investment strategy that matched assets and liabilities the way life insurance companies are required to do, the severe losses would have been avoided and much more principal would have been preserved and steady predictable cash flow from fixed income investments would have been available to meet long term payment obligations under the SSA's.

### *Lack of verification of transferred reserves*

101.    The Order of Rehabilitation required the Rehabilitator to, within 60 days, "file with the Court a report setting forth the results of the policyholder elections under the Plan and the aggregate statutory reserves transferred to MetLife in connection with the exchange and assumption transactions contemplated by the Plan" (Plan II R.)  No such report was ever filed.

### *Lack of verification of ceding commission*

102.    The Rehabilitator had represented that one of the considerations upon which he relied in accepting MetLife's proposal was that MetLife "offered the highest ceding commission[.]"  Yet the limited documentation available suggests that the Rehabilitator did not follow up to verify the amount of ceding commission owed by MetLife, or that the full commission was paid.

103.    Annual filings submitted privately to the Superintendent of Insurance for the years 1993 – 1998 show inconsistent information regarding the ceding commissions.   For example, the filings identify the following commissions as due or receivable from Metlife:

| | |
|---|---|
| 12/31/1993 | $80,985,433 |
| 12/31/1994 | $55,157,854 |
| 12/31/1995 | $31,922,217 |
| 12/31/1996 | $26,270,883 |
| 12/31/1997 | $26,270,883 |
| 12/31/1998 | $0 |

104.    These same filings reflect inconsistent information as to commissions actually received from MetLife.   The only references to commissions received in the Bureau's filings are as follows:

| | |
|---|---|
| 12/31/1994 | $53,952,333[3] |
| 12/31/1995 | $23,235,647[4] |
| 12/31/1996 | $ 6,903,151[5] |
| Total received: | $84,091,131 |

105.    No payment of commissions is reflected in the Bureau's 1997 or 1998 filings. Instead, the 1998 ELNY Financials contains a Statement of Cash Receipts and Disbursement for the year ending December 31, 1998 that reflects a "Return of commission to metlife" in the

---

[3]In the 1994 ELNY Financials, a paragraph titled "Other Corporate Data" for the year ending December 31, 1994 includes an entry for "Commissions Received re: Policy Exchange" in the amount of $53,952,333. No other information on cash receipts or disbursements was given for the year ending December 31, 1994.

[4]The 1995 ELNY Financials include a note on the ceding commission payable by MetLife and state that "In 1995, ELNY received the third of four payments due in the amount of $23,235,647."

[5]In 1996 ELNY Financials include a note on the ceding commission payable by MetLife and state that "In 1996, ELNY received the fourth of four payments due in the amount of $6,903,151."

amount of $10,149,152.  Additionally, from 1997 to 1998 the "commissions receivable" amount goes from $26,270,883 to $0 with no explanation.

### *Suspicious Payments*

106.    ELNY and MetLife made substantial payments or have scheduled payments in the future that on their face appear suspicious, including:

a)    Several "annuities" have stated present values that not only would be historically unheard of in the industry, but that would be virtually impossible with ELNY's single premium limit of $1 million and the level of impairment associated with the annuitants. For example, one annuity allegedly has a present value of nearly $40 million; another has a present value of approximately $25 million.  The ten largest annuities allegedly have face values of $177,163,246, and are facing cuts of tens of millions of dollars, yet none of the ten filed objections.

b)    Hundreds of payments are being issued to unverified "lockboxes," an unusually high number, all of which are believed to have been created after the takeover of ELNY.

c)    Some annuities were supposedly issued to policyholders with issue dates of 1992 and 1994, but ELNY had not written any new business after April 23, 1991, when it was placed into rehabilitation.

d)    The Liquidation Bureau's records showed payments being issued to thousands more payees than were reflected in the records of MetLife.  For example, in 2002, the Bureau said that ELNY had 13,124 active policyholders and had paid out benefits to more than

9,400 individuals.  However, MetLife's records showed 9,144 active policyholders and payments to only 5,778 individuals.

        e)      The Bureau reported having "lump sum" payments due for an improbably high number of consecutive periods, for example, 60 consecutive months.

        f)      Part of the contractual duties for which MetLife was receiving payment included keeping mortality data, e.g., checking payees against the Social Security Death Index. However, MetLife never bothered to do so before 2002.  When MetLife began checking the "lives," it learned that it had been making payments to persons who were in fact deceased and not entitled to continued payment.

### Concealment and nondisclosure of ELNY's deteriorating financial condition

107.    In 1992, Deputy Superintendent Foley predicted that the ELNY rehabilitation process would take "four or five years," or possibly less.  By 1999, however, the Bureau was taking the position that it could in fact take up to one hundred years before the last policyholder was paid and the company finally liquidated.

108.    By that time, former Deputy Superintendent Kevin Foley had become Vice President of External and Internal Communications at MetLife.  Other Bureau employees were enjoying long-term employment and State benefits.  In one meeting with a representative of an investor in 2001, then-Deputy Superintendent Joseph Termini stated literally or in essence, "Why would we want to sell it [ELNY], when we can sit here and clip coupons all day?"

109.    Meanwhile, neither annuitants nor the Rehabilitation Court knew what was happening behind the scenes.  The Liquidation Bureau never advised the Rehabilitation Court

that the representations upon which the court had relied in 1992 were no longer valid (or had never been valid). Moreover, no financial reporting was published by the NYLB regarding ELNY until the 1994 annual statement which was published in 1995. Consequently, the NYLB and CS have been able to avoid disclosing what First Boston was paid or what other expenses were incurred from April 1991, a period of three full years. From 1992 until 2010, the Bureau never filed any reports with or otherwise updated the rehabilitation court with respect to the SPIAs.

110. The actions of the Liquidation Bureau, MetLife, and the Credit Suisse Defendants described herein were also not known or knowable to the public. MetLife and the Credit Suisse Defendants signed broad confidentiality agreements. Midway through the ELNY rehabilitation, the Bureau offered substantial sums of money (thousands of dollars) to current employees to sign confidentiality agreements barring them from disclosing what they witnessed at the Bureau. The Bureau successfully contended that it was not subject to Freedom of Information laws, and it did not file public reports. It never brought in an independent auditor.

### *Impeding prospective investors*

111. On at least three occasions prior to 2007, groups of potential buyers advised the Receiver of an interest in purchasing ELNY's liabilities and assets. On each occasion, the Receiver directly interposed impediments to the performance of due diligence and other investment-related activities. These included:

112. Between late 1999 and mid-2001, an outside group of investors expressed interest in buying ELNY. Bureau personnel initially denied access to ELNY's records. When the

investors persisted, they were eventually taken to a room where they were permitted to look at some documents provided by the Bureau, but not to make any copies.

113.    On another occasion, members of the group sought to examine the original ELNY annuity contracts, which were stored at a warehouse.  Upon arrival, the investors were informed by warehouse personnel that they were the first persons to ever request access to the contracts. The investors were allowed only a few hours to examine the ELNY documents, which included more than 10,000 contracts, and were prohibited from removing documents or making copies.

114.    The Bureau instructed MetLife not to let these investors see the actual annuity contracts, and instructed Credit Suisse not to disclose information about its investment strategies.

115.    In 2000, the Bureau told its actuary, Milliman, to provide information regarding ELNY's liabilities to the prospective investors.  However, the Bureau first told Milliman to augment the liabilities.  According to Milliman's analysis in 1999, the gross liabilities of ELNY from January 2006 through September 2119 were estimated at $6.9 billion.  But in 2000, the gross liabilities for the same period were estimated at $7.4 billion, a difference of $500 million. The increase in gross liabilities was performed at the specific request of the bureau, and not pursuant to any independent review or analysis by Milliman.

116.    As one component of this increase, Milliman reported an increase in gross liabilities for "period certain" policies of $300 million.  A "period certain" policy is one that guarantees a fixed number of payments at a fixed amount, and is not subject to any variable such as mortality, cost-of-living or inflation indices.   Upon information and belief, this $300 million

reflected an understatement of ELNY's period-certain assets by the Bureau in 1992.  See ¶ 35, *supra*.

117.    In July 2001, the investors made a proposal to purchase ELNY, conditioned on a contract-by-contract review of ELNY's annuities.   The investors also warned the Liquidation Bureau that, from their review, annuitants would face up to a $1 billion shortfall without a significant cash infusion or materially improved return on investments.

118.    The Liquidation Bureau was already aware that ELNY was at risk of a significant shortfall.   Each year from 1993 until 2006, the Liquidation Bureau sent a report to the Superintendent of Insurance in his capacity as regulator that summarized the Bureau's activities for the year.   Each report included a "Comparative Balance Sheet" comparing ELNY's assets with its liabilities.   Beginning in 1998, Bureau personnel began adding a seemingly innocuous comment to these reports:

> The Comparative Balance Sheet was prepared for the internal use of the New York Insurance Department.  Specifically, the Comparative Balance Sheet reflects the use of historic reserve standards solely for the purpose of comparison to prior periods.  The use of historical reserve standards substantially understates reserves when compared to reserves that would be required to satisfy regulatory requirements for a going concern insurance carrier.   As a consequence, the use or interpretation of these financial statements by anyone other than the New York Insurance Department would be materially misleading. *[1998 Annual Report, p. 36]*

119.    The "historic discount rate" used by the Liquidation Bureau in its Comparative Balance Sheets for ELNY was 10 percent or higher.   Internally, however, Bureau personnel had concluded that no reasonable insurer would use a discount rate that high to calculate liabilities.   At that time, the Bureau was internally using a discount rate of 6.25 percent.   Accordingly, no

later than 1998 the NYLB knew that the discount rate it was using for ELNY was not valid.  It also knew, from its own actuary, the impact of using a 6.25 percent discount rate on its liabilities: they would increase dramatically requiring ELNY to be liquidated and the Bureau's cash flow from ELNY would end.  Rather than pursue an orderly liquidation in 1998, the Bureau actively concealed the true state of ELNY's financial condition for another 12 years.  Had ELNY been placed into liquidation in 1998, hundreds of millions of dollars in losses could have been avoided.

120.    The Liquidation Bureau rejected the offer without disclosing it to the rehabilitation court or annuitants, and took no action in response to the warning about shortfalls. On the contrary, the NYLB continued to avoid disclosure of the true state of ELNY's affairs.

### *The Bureau eventually faces exposure*

121.    The NYLB had within its control nearly $4 billion in assets.  Nearly two billion of that consisted of what the Rehabilitator told ELNY annuitants was "your money".  Any prudent company, and any fiduciary fulfilling his duties as such, would have directed periodic independent audits.

122.    Prior to the takeover of ELNY, the Bureau had generally cooperated with audits requested by the State Comptroller's office.  For example, no limitations were placed on the Comptroller in 1976, 1984, and 1990.  In 1994, the Comptroller performed a follow up audit limited to items that had been reviewed in 1990.  No limitations were placed on this follow up.

123.    In 1996, however, the Bureau for the first time refused unrestricted access to its records and personnel.  The Comptroller reported that, "During our work, Department and

Bureau officials prevened auditors from examining relevant records related to the liquidation of one estate and employee personnel-related records. Our audit staff was precluded from interviewing agency managers and operating personnel without senior management present, thereby creating an environment where those individuals could not speak freely." In 2001, the Bureau's denial of access was so severe that the Comptroller could not even issue a report.

124.   In 2004, the Comptroller requested a comprehensive audit, which was to include a review of ELNY's assets and contracts. The Bureau refused. On July 23, 2004, the Comptroller issued subpoenas, and on November 17, 2004, the Superintendent filed suit to quash the subpoenas.

125.   On June 30, 2005, a Supreme Court quashed the subpoenas, and the Comptroller appealed. On March 6, 2007, the Appellate Division ruled that the Comptroller could enforce its subpoenas. On October 11, 2007, the Court of Appeals ruled that the Comptroller lacked statutory authority to audit the Bureau without its consent, but noted that the legislature could require an independent audit.

126.   Meanwhile, by mid-2005, then-New York Attorney General Elliot Spitzer was considered likely to be elected governor the following year. Mr. Spitzer was campaigning on an anti-corruption and governmental transparency platform.

127.   In late 2005 or early 2006, Bureau officials went to the National Organization of Life and Health Guaranty Associations (NOLHGA), and the two entities began working on a plan to liquidate ELNY. The Bureau did not inform annuitants of ELNY's insolvency.

128.    In August 2006, the then-Special Deputy in Charge of the NYLB was fired for suspected corruption (of which she was later convicted (plead guilty)).  Governor-elect Spitzer identified an investigation of the Liquidation Bureau as a high priority.  In January 2007, a new Superintendent of Insurance was appointed.  In March 2007, the Appellate Division ruled that the Comptroller had the authority to audit the Liquidation Bureau.  The Liquidation Bureau appealed.

129.    Meanwhile, Bureau personnel began contacting insurance companies and others, such as purchasers of structured settlements, demanding that they contribute money to shore up ELNY or face punitive actions by the Department of Insurance.

130.    In May 2007, the new Superintendent announced that the Liquidation Bureau was going to be subjected to a "top to bottom" audit by an independent auditor for the first time in the Bureau's history.

131.    When auditors began their work a few months later, they discovered the Liquidation Bureau's financial records in complete disarray.  For the audit to take place, Bureau personnel had to "reconstruct" the financial records of all 60 of its estates.

132.    Bureau officials also manipulated the audit itself.  For example, although ELNY had many thousands of files, Bureau personnel selected only 500 of ELNY's files to be reviewed.  Of those, only 50 percent were SSAs, even though SSAs comprised most of ELNY's liabilities.  Additionally, no provision was made for the auditor to verify the existence of payees or the amount of benefits being paid to them.

133.    In December 2007, Liquidation Bureau personnel told Governor Spitzer and the new Superintendent that a deal had been reached with insurance companies and others assuring 100 percent payment to ELNY policyholders.  On December 12, 2007, Governor Spitzer held a press conference to announce the good news.  Bureau personnel quickly arranged for Eric Rabinowitz, a visually impaired ELNY annuitant, to attend the event, sending a car to drive him.

134.    Based upon information from the Liquidation Bureau, Gov. Spitzer announced:

Upon taking office in April 2007, the Liquidation Bureau's new management immediately implemented an intensive reform effort.  Given the vulnerability of the thousands of individuals affected by ELNY's deficit, the Bureau identified ELNY as a priority. . . . The New York Liquidation Bureau has successfully resolved a significant deficit from a defunct insurance company that threatened annuity payments to nearly 11,000 disabled and dependent individuals. . . . More than five years ago it became clear that ELNY was threatened by a substantial shortfall, but the problem went unaddressed, jeopardizing the primary financial lifeline of thousands of victims of cataclysmic injuries and pensioners. . . . It is projected that in approximately 12-15 years, the funds would be depleted and ELNY would have a $2 billion deficit.  After Superintendent Dinallo took office, the Liquidation Bureau took quick and aggressive action to resolve the deficit before it endangered recipients. . . . This is a great day for the insurance industry, which stepped forward to make sure that vulnerable victims do not lose their financial support.  This event emphasizes how important insurance is to the lives of New Yorkers.  It also demonstrates the excellent job Mark Peters and his entire staff are doing in turning around the Liquidation Bureau."  *[Spitzer release 12/4/07]*

135.    Unknown to the Governor, no deal had been reached.  Instead, the Liquidation Bureau was still working privately with NOLHGA on the plan to liquidate ELNY.

136.    In October 2008, the independent auditors uncovered what Bureau officials already knew:  that the Bureau had been understating ELNY's shortfall by more than $1 billion for years.  Examining the ELNY estate as of December 31, 2006, the auditor concluded that ELNY's liabilities exceeded its assets by $1.26 billion.

### *Replacement of Credit Suisse in 2009*

137.    On March 12, 2009, NYLB Deputy General Counsel Tarik F. Ajami met privately with Rehabilitation Court judge Daniel Martin.  The purpose of the visit was to discuss with the judge the Bureau's desire to quietly replace Credit Suisse as investment advisor without having to notify anyone.

138.    On March 18, 2009, this visit was followed up with a hand-delivered letter "in lieu of a formal memorandum of law."  In the letter, Mr. Ajami characterized the replacement of Credit Suisse after nearly 19 years as the ELNY investment advisor as a "housekeeping," "purely ministerial," "non-material" matter "of simple estate administration" that should not require notice to anyone.  "[A]s a structural matter, there are no other parties to this action," the Bureau noted.  "Given the above, there is no reason this purely ministerial matter would require notice to any other person or entity," Mr. Ajami said.

139.    In a single sentence in the last paragraph of the 3-page letter, Mr. Ajami concluded the letter asking the court to permit the Bureau to select new financial advisors, and mentioning in passing a desire to revise the Bureau's investment guidelines.

140.    The *ex parte* letter was accompanied by an affidavit of Dennis J. Hayes, Assistant Special Deputy Superintendent and agent of Eric R. Dinallo, Superintendent.  In the affidavit, which was not served upon anyone, Mr. Hayes did not identify any concerns or malfeasance by Credit Suisse or its predecessor, First Boston Asset Management, or otherwise disclose information regarding potential malfeasance.

141.    Judge Martin signed the enclosed Order, which allowed the NYLB to replace Credit Suisse and to, "from time to time, amend the Guidelines set by the Rehabilitator in consultation with his new financial advisors, if the Rehabilitator deems it to be beneficial to ELNY."    The NYLB selected Wellington Management Company, LLP and Goldman Sachs Asset Management as asset managers.

### The Bureau proceeds with liquidation

142.    From 2006 throughout this period, the Bureau and NOLHGA had continued working on a plan to liquidate ELNY and transfer its assets to a company to be formed in the District of Columbia and controlled by NOLHGA's president.

143.    Bureau personnel knew that, under this plan, more than 1,400 annuitants would face cuts in the present value of their benefits of up to 66 percent.  The Bureau did not disclose its intentions to the Rehabilitation Court until December 2010, when it filed an *ex parte* motion stating an intent to liquidate ELNY, or to annuitants until December 2011, when it began notifying Shortfall Payees for the first time that their benefits were to be cut.

144.    In March 2012, a hearing was held regarding the plan on which the Liquidation Bureau and NOLHGA had been collaborating since 2006.  During the hearing, the Bureau successfully prevented annuitants from exploring the causes of ELNY's insolvency.  After finding from the evidence presented that ELNY's liabilities exceeded its assets by more than $1 billion, the Rehabilitation Court approved the proposed plan of liquidation.

145.   Under the plan of liquidation, the Representative Plaintiffs and other Shortfall Payees face a loss of benefits exceeding $920 million.   The order approving the plan of liquidation is currently on appeal.

## CAUSES OF ACTION

### BREACH OF FIDUCIARY DUTY
#### *(The Rehabilitator Defendants)*

146.   The allegations of this Complaint are realleged and incorporated by reference herein.

147.   The Rehabilitator Defendants owed fiduciary duties to the Plaintiffs and to the ELNY estate.  The source of such duties included:

a.   The Rehabilitator Defendants acted in the capacity of court-appointed, private receivers;

b.   The relationship between Shortfall Payees and the Rehabilitator Defendants was founded upon trust and confidence in the integrity and fidelity of the Rehabilitator's management of ELNY's assets;

c.   The Rehabilitator Defendants acknowledged owing a fiduciary duty to act in the interests of and on behalf of annuitants;

d.   The Rehabilitator Defendants acknowledged that, under the circumstances, ELNY's money was Plaintiffs' money;

e.   As receivers, the Rehabilitator Defendants owed fiduciary duties to policyholders and creditors arose once the corporation in receivership became insolvent.

148.    As a fiduciary, the Rehabilitation Defendants owed certain fiduciary duties to both the Plaintiffs and to the ELNY estate, which duties included:

     a.      to act in good faith and with appropriate care and prudence to preserve and protect ELNY assets for the benefit of all annuitants;

     b.      to maintain, invest, manage, and administer ELNY assets in a reasonable and prudent manner;

     c.      undivided loyalty to policyholders;

     d.      to refrain from self-dealing and otherwise acting in their own interests;

     e.      to refrain from conduct that will result in the waste of ELNY assets;

     f.      to disclose material information to their beneficiaries, and not to conceal material information;

     g.      to refrain from making, and to correct, material misstatements;

     h.      to reasonably select and monitor third parties performing services or to whom the Rehabilitators delegated their duties;

     i.      to investigate and pursue recoveries on behalf of the annuitants or ELNY for breaches of duties by third parties, such as the breaches alleged herein by MetLife and the Credit Suisse Defendants.

149.    The Rehabilitation Defendants breached the above duties by, among other things: violating a court order with respect to asset allocation, employing a high risk tax inefficient investment strategy that created impermissible preferences, wasting precious assets by paying Bureau expenses that were excessive and not related to the management of the ELNY estate –

much of which was outsourced, failing to audit MetLife records and reconcile data with the social security death master file and not seeking a purchaser who could and would honor ELNY's policy obligations.

150.    The Plaintiffs have been and will be damaged as a result of the Rehabilitation Defendants' breaches of fiduciary duty, including the loss of benefits under their ELNY annuities, and the incurring of liability for attorney fees and expenses.

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (MetLife)

151.    The allegations of this Complaint are realleged and incorporated by reference herein.

152.    The Rehabilitation Defendants breached their fiduciary obligations to the Plaintiffs as described above in the First Claim for Relief.

153.    MetLife had actual knowledge of the Rehabilitator Defendants' status as a fiduciary to ELNY Policyholders.  In addition to the fact that such a relationship existed as a matter of law due to the relationship and the Rehabilitators' role as a receiver, the Rehabilitator and his agents also acknowledged such relationship in public filings as early as 1992.

154.    Met Life had actual knowledge that the Rehabilitators' duty encompassed preserving ELNY's assets.  Among other things, MetLife representatives were present on September 23, 1992, when the Rehabilitator's agents repeatedly acknowledged such duty.

155.    MetLife had actual knowledge that, by engaging in "bid rigging" with the Rehabilitator in order to strip ELNY's highest-quality assets and committing related misconduct described in ¶ 25-38, *supra*, the Rehabilitator was violating its obligations to Policyholders.

156.    Metlife affirmatively and substantially assisted in NYLB's breach of fiduciary duty by entering into the rigged deal, implementing and benefiting from the deal, apparently providing inducements for the deal (*e.g.*, a lucrative future employment opportunity for the Rehabilitator's Representative), aiding in concealment of the misrepresentations made to obtain approval of the deal (¶ 25-44).

157.    The Plaintiffs have been and will be damaged as a result of MetLife's aiding and abetting of the Rehabilitation Defendants' breaches of fiduciary duty, including the loss of benefits under their ELNY annuities, and the incurring of liability for attorney fees and expenses. All of these actions proximately caused the harm on which the primary liability is predicated.

158.    MetLife received ill-gotten gains from its aiding and abetting of the Rehabilitators' fiduciary duties equaling hundreds of millions of dollars, including profits made from the receipt of ELNY's Single Premium Deferred Annuity and traditional life insurance books of business and renewals, profits made on surrender charges to former ELNY policyholders, and profits made on the investment of high-quality assets received under the deal.

## BREACH OF CONTRACT / UNJUST ENRICHMENT
### *(MetLife)*

159.    The allegations of this Complaint are realleged and incorporated by reference herein.

160.    MetLife had a contract with the Rehabilitator Defendants, as described in ¶¶ 78-82, *supra*.

161.    Under the aforesaid contract, MetLife was required to perform certain tasks, including administering the ELNY SPIAs in a manner substantially similar to the administration of its comparable type of business, and verifying and maintaining mortality data, see, e.g., ¶¶ 78-82, *supra*.

162.    For all or a portion of the life of the contract, MetLife did not perform the services identified in ¶¶ 78-82, *supra*. See ¶ 106, supra.

163.    MetLife received unearned compensation from ELNY, at the expense of ELNY's annuitants.  Additionally, MetLife's failure to perform such services resulted in the inappropriate expenditure of funds, such as the payments made on behalf of deceased individuals whose benefits terminated at death.

164.    MetLife was unjustly enriched by the receipt of compensation that was not earned.

165.    Under principles of equity, MetLife should not be permitted to retain the compensation wrongfully received.

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### *(Credit Suisse Defendants)*

166.    The allegations of this Complaint are realleged and incorporated by reference herein.

167.    The Rehabilitation Defendants breached its fiduciary obligations owed to the Plaintiffs and to ELNY in the manner described above in the First Claim for Relief.

168.    The Credit Suisse Defendants had actual knowledge of the Rehabilitation Defendants' status as a fiduciary to the Plaintiffs and to ELNY Policyholders.  Among other things, the fiduciary relationship was provided by law and statute, the Rehabilitation Defendants acknowledged the fiduciary relationship in public filings, and the Credit Suisse Defendants were aware that the assets under the control of the Rehabilitation Defendants were the sole source of funding for long-term payment obligations to the Plaintiffs.

169.    The Credit Suisse Defendants had actual knowledge that by the actions described in ¶¶ 93-141, supra, the Rehabilitation Defendants were violating their fiduciary duties.

170.    The Credit Suisse Defendants substantially assisted in NYLB's breach of fiduciary duty by affirmatively implementing an imprudent and unsuitable investment strategy that was incompatible with the nature of the liabilities dependent upon ELNY's assets, actively participating in the violation of court-ordered limitations on investment activities, and other actions described in ¶¶ 93-141, *supra*.

171.    The Plaintiffs suffered damages as a result of the breach, in an amount equal to or greater than the amount of lost present value of the Plaintiffs' SPIAs.  Additionally, the Plaintiffs have been required to incur liability for attorney fees and litigation expenses.  The actions of Credit Suisse proximately caused the harm on which the primary liability is predicated.

## FRAUDULENT OMISSION
### *(The Rehabilitator Defendants)*

172.   The allegations of this Complaint are realleged and incorporated by reference herein.

173.   The Rehabilitator Defendants owed a duty to the Plaintiffs to disclose material information to the Plaintiffs.

174.   The Rehabilitator Defendants further assumed a duty of disclosure to the Plaintiffs by, among other things,

a.     Claiming to be acting in the interests of and on behalf of the Plaintiffs, and relying upon that justification to refuse to provide notices, information, and documents to the Plaintiffs. *See, e.g.,* 9/23/92 Hearing Transcript, pp. 3, 6, 21, 44-45, 47, 49-50, 52-54, 165.

b.     Affirmatively representing that they would keep the Plaintiffs apprised of material developments relating to their ELNY annuities, *see* ¶¶ 58, 66, 91, *supra;*

c.     Making material representations upon which a third party (the rehabilitation court) relied to the detriment of the Plaintiffs, thereby creating a duty to correct such representations when learned to be false or no longer valid.

175.   The Rehabilitator Defendants fraudulently concealed and failed to disclose material information to the Plaintiffs, *see, e.g.,* ¶¶ 34-38, 93-100, 102-120, 131-143, *supra.*

176.   As a result of said breaches of duty, the plaintiffs have been and will be damaged, including the loss of benefits under their ELNY annuities and the incurring of liability for attorneys fees and expenses.

## BREACH OF FIDUCIARY DUTY
### *(Credit Suisse Defendants)*

177.    The allegations of this Complaint are realleged and incorporated by reference herein.

178.    The Credit Suisse Defendants acted as the Rehabilitators' financial advisor with respect to ELNY's investment accounts. *See* ¶¶ 45-66, *supra*.

179.    The Credit Suisse Defendants had and exercised broad discretion in the investment of ELNY's assets. *See* ¶¶ 45-59, 93-100, *supra*.

180.    The Credit Suisse Defendants knew that the Rehabilitator Defendants did not have the resources, expertise, or ability to adequately monitor the Credit Suisse Defendants' activities.

181.    The Credit Suisse Defendants had a duty to consider the long-term investment needs of ELNY and the Plaintiffs, and to select investments suitable with such needs and to maintain an asset allocation that was consistent with that strategy.

182.    The Credit Suisse Defendants had a duty to comply with court-ordered limitations or parameters regarding the investment of ELNY's assets.

183.    The Credit Suisse Defendants had a duty to act with utmost loyalty to the Plaintiffs and ELNY, and not to act in their own self-interest adversely to the Plaintiffs and ELNY.

184.    Credit Suisse breached its fiduciary duties by, among other things, engaging in the actions described in ¶¶ 93-141, *supra*.

185.    The Plaintiffs and ELNY were each damaged by Credit Suisse in an amount at least equal to the amount of losses described in ¶ 171, *supra*.

186.    It would be inequitable to permit the Credit Suisse Defendants to retain the profits made through the commission of these breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in their favor and against Defendants as follows:

A.    That this action be certified as a class action;

B.    That plaintiffs be appointed as the representatives of the Class;

C.    That counsel for plaintiffs be appointed as counsel for the Class;

D.    That an order be issued providing for reasonable notice to be given to the members of the Class;

E.    For the full present value of each Class Member's annuity issued by ELNY;

F.    Damages equaling the full present value of each Class Member's annuity issued by ELNY, less any amount determined to be owing to Plaintiff under the terms of ELNY's liquidation;

G.    Damages equaling the amount of each defendant's unjust enrichment and ill-gotten gains.

H.    Attorney fees and litigation expenses, to the extent permitted by contract or law;

I.    Pre- and post-judgment interest, to the extent provided by contract or law; and

J.    Such other equitable relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand trial by jury, and pays the requisite jury fee concurrent with filing of this Complaint.

DATED this _____ day of November, 2012.

Edward S. Stone (ESS 2247)
277 Broadway, Suite 1405
New York, New York 10007
(203) 504-8425

Roger P. Christensen (RPC 7570)
Karra J. Porter (KJP 9334)
Kristen C. Kiburtz (KCK 1502)
CHRISTENSEN & JENSEN, P.C.
15 West South Temple, Suite 800
Salt Lake City, Utah  84101
(801) 323-5000
*Admission pro hac vice pending*

*Attorneys for Appellants/Objectors*